Holland *v.* Unemployment Compensation Board of Review.

Argued October 22, 1971, before Judges KRAMER, MANDERINO and MENCER, sitting as a panel of three.

*Richard C. Shomaker,* with him *Anthony A. Barrante* and *Barrante, Barrante & Shomaker,* for appellant.

*Sydney Reuben,* Assistant Attorney General, with him *J. Shane Creamer,* Attorney General, for appellee.

OPINION BY JUDGE MENCER, January 3, 1972:

This is an appeal from the decision of the Unemployment Compensation Board of Review (Board) denying benefits to Doris L. Holland (claimant) under Section 402(e) of the Unemployment Compensation Law of 1936, as amended, 43 P.S. §802(e), which provides: "An employe shall be ineligible for compensation for any week— * * * (e) In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, * * *." Both the Bureau of Employment Security and the referee had rendered similar decisions.

The Findings of Fact of the Board were as follows:

"1. The claimant was last employed by Burger King, Incorporated, Allison Park, Pennsylvania, as a manager at $150.00 a week plus a commission for six

.and a half months. Her last day of work was April 2, 1970.

"2. On claimant's last day of work she was discharged for violation of the company rules concerning attendance at work and hours of work.

"3. Claimant had knowledge of the company rules and procedures.

"4. The claimant's condition of employment was based on a requirement that she work fifty-four hours per week and, in particular, her hours were designated from 8 to 8:30 A.M. until 5:00 P.M., six days per week.

"5. The claimant had undertaken on her own to work a fifty-hour week and when confronted by her supervisor with a request that she agree in writing to abide by company policy, she refused this reasonable request by the employer."

The crux of the problem here revolves around the alleged existence of a written contract between claimant and the employer, Burger King, Inc., which agreement supposedly permitted claimant to "cut down" her 6-day work week of 54 hours to 50 or less hours a week after the operation of a new store (which she was to head as manager) was satisfactorily underway.

After the store was so underway, claimant evidently did spend fewer hours in the store. Her District Supervisor, John Rothwell (Rothwell), over an eight-day period called her at the store between 3:30 and 4:00 p.m. and was unable to reach her several times. In fairness to claimant, it is possible that Rothwell was unable to reach her because she may have been out of the store "bootstrapping" or doing public relations work required of her as store manager.

Since the store opened at 11:00 a.m., claimant was to begin work between 8:00 and 8:30 a.m., and, since she was to "break the store's bank," or count the first half of the day's receipts with the Relief Manager at

5 p.m., claimant was required to be in the store between those hours.

Evidently concerned that the store was being left without supervision too often and that only one manager was "breaking the bank" each day, Rothwell paraphrased in his own handwriting, on two lined pages of yellow paper, certain of the employer's rules (as stated in the company operating manual for stores) which he thought were being violated, and he then requested claimant and the Relief Manager to sign these papers.[1]

---

[1] Rothwell read the following from the company operating manual at the second hearing, R. 5:

"This is a job description for the manager. The first sentence is that the manager is responsible for the total over-all operation of his unit. He will see that all foods and supplies are ordered and that they meet Burger King Company specifications. It will be his responsibility that all food items are prepared and served properly. The manager will be responsible for the hiring, evaluation and termination of all store employees. He will see that the store equipment and building are properly maintained and cleaned. The manager is responsible for maintaining a sound store security program as outlined in this manual. He will be responsible for all moneys, i.e., store bank, sales receipts, petty cash, etc. The manager is responsible for maintaining all Burger King forms necessary for the bookkeeping and accounting records connected with his unit. The manager is responsible for store profit and is specifically responsible for all store operating costs. The manager should arrive at his unit two and a half to three hours prior to opening. His hours should overlap with the assistant manager's hours so as to provide proper communications between the two. I'm going to list the specific duties as set forth here. * * * Item 21. With the assistant manager break the store bank at 5:00 P.M."

The following appeared on the two yellow sheets of paper:

"(1) Day Manager working hours are from 8-8:30 AM until after the cash drawers are pulled and counted at approx. 5:00 PM. At no time will there be less than two managers on duty while the cash is being counted and the night shift is coming on duty. At no time is the relief manager to be pulling the drawers or counting money. On the two evenings that the relief mgr. is on duty the manager in charge of the day shift will pull the drawers & count the money. pp. 604-605, Sec. 13, BK Ops Manual.

Claimant refused to do so contending that the rules were policy changes and in contravention of the written contract which she originally entered into. After a week had passed, Rothwell again asked claimant to sign the papers, but she again refused whereupon her employment was terminated.

In this case, in order for the Board to have denied compensation because of "willful misconduct" under Section 402(e) of the Unemployment Compensation Law, it would have had to conclude (1) that no written contract existed between claimant and employer, or at least no such contract modified the store manager's hours of employment as stated in the company manual; (2) that the rules paraphrased on the papers correctly mirrored those in the company manual or at least were reasonable under the circumstances; and (3) that Rothwell was reasonably justified and correct in insisting upon a written assurance of compliance with company rules rather than a mere verbal assurance.

As to (1), the Board, in Findings of Fact Nos. 4 and 5, impliedly concluded that no written contract existed modifying the hours of employment. This conclusion is conclusive and binding upon us since substantial competent evidence does exist in the record to support these findings. *Devlin Unemployment Com-*

---

"(2) At no time will store manager have more than one day off per week without a written memo from me. This includes both day and night managers.

"(3) At no time is anybody but the Day or Night manager to conduct tours thru BK 463. Only one (1) free whopper card is to be given to any adult member of a tour.

"(4) All plans for any "P.R." work or "Bootstrapping" will be submitted to me one week in advance stating (1) when the P.R. is going to be done, (2) where is the company, (3) approx. how many cards will be given out. If at any time the manager on duty is gone from the building during working hours without another mgr. on duty there then appropriate action will be taken."

*pensation Case,* 165 Pa. Superior Ct. 153, 67 A. 2d 639 (1949) ; Section 510, Unemployment Compensation Law, 43 P.S. §830. The Board, as the trier of fact, chose to believe Rothwell that only an oral employment agreement was made, parts of which were certain P2A forms each titled "Personnel Hire/Change Authorization" (the earliest of these, although not signed by claimant, has the figure "54" under the abbreviation "Stdr. Hrs."), claimant's application form, and, by implication, the company operating manual. Furthermore, the first of two hearings concerning the case was adjourned in order to obtain, from Burger King's home office, the papers which comprised the employment agreement, including the alleged written contract, if any existed. No written contract was produced at the second hearing. In addition, claimant acknowledges that when she called the home office to request that the written contract be sent, she was told that no such contract existed. (R. 21; second hearing)

Concerning (2), the Board, in light of the duties of a store manager (see note 1, *supra*), obviously concluded that Rothwell's paraphrasing was correct and entirely reasonable under the circumstances. We must agree. Except for minor details meant to inform Rothwell of store routine, the paraphrasing reflects company policy.

Finally, as to (3), "Absences from work affect production, frequently make it impossible to utilize to the full extent the services of employes who are present and, when repeated time and again, without justification, tend to disrupt the discipline and order necessary for the proper maintenance of any enterprise." *Devlin Unemployment Compensation Case, supra,* 165 Pa. Superior Ct. at 155, 67 A. 2d at 640. Rothwell's inability to reach claimant by telephone on several occasions during her working hours was sufficient reason to ask

for an assurance from claimant that she would abide by employment hours. Whether or not claimant actually was absent from the store too much, Rothwell was justifiably concerned, and it was not unreasonable for him to have demanded some tangible promise of compliance, especially when, with slight exceptions, the papers were not really policy changes at all.

"Willful misconduct" is not defined in the law, but it has been defined as including a deliberate violation of standards of behavior which the employer has the right to expect of his employe. *Detterer Unemployment Compensation Case,* 168 Pa. Superior Ct. 291, 77 A. 2d 886 (1951).

Claimant's insistence that she was not required to work 54 hours a week, her unreasonable refusal to agree that she would work the full number of hours expected of her, and her obvious intention to cut back her weekly hours to 50 or less constituted "willful misconduct" within the meaning of Section 402(e). After reviewing the entire record carefully, we conclude that the decision is supported by competent and substantial evidence.[2]

Decision affirmed.

---

[2] Although not raised by either party, we are aware of Section 3(a) of the Women's Labor Law, Act of July 25, 1913, P. L. 1024, as amended, 43 P.S. §103(a), which states in pertinent part: "Except as hereinafter provided, no female eighteen (18) years of age or older shall be employed or permitted to work in, or in connection with, any establishment for more than six (6) days in any one week or more than forty-eight (48) hours in any one week, or more than ten (10) hours in any one day."

This section may be inapplicable here because, according to an Official Opinion of the Attorney General, dated November 21, 1969, the Women's Labor Law, insofar as it pertained to employment of females, is "impliedly superceded by the [Pennsylvania] Human Relations Act", Act of October 27, 1955, P. L. 744, as amended, July 9, 1969, P. L. 133, 43 P.S. §951 et seq. In addition, Section 3(b), 43 P.S. §103(b), states, in part: "Nothing in this section or in any

DISSENTING OPINION BY JUDGE MANDERINO, January 3, 1972:

I dissent. Findings of Fact by the Unemployment Compensation Board can be affirmed only if the record contains evidence to substantiate the Findings. The Board in this case made 5 Findings of Fact. The key Finding of Fact is number 4, which states:

"4. The claimant's condition of employment was based on a requirement that she work fifty-four hours per week and, in particular, her hours are designated from 8 to 8:30 A.M. until 5:00 P.M., six days per week."

There is no evidence in the record to substantiate this Finding. In fact, the employer's testimony on this point was as follows:

"A. 'Well all employees are hired on a basis of 54 hours a week in any restaurant operation. Inasmuch as Mrs. Holland is responsible for the entire store, *there is no absolute limit as to what hours are necessary. If everything is operating correctly then she would have her prerogative to cut these down.*'" (Emphasis added).

This testimony does not say that the claimant was required to work fifty-four (54) hours a week. It states that she had the "prerogative to cut" the hours if everything was operating correctly. There is no Finding of Fact that things were not operating correctly.

Since there is no evidence in the record to substantiate Finding of Fact Number 4, and since this Finding is essential to the legal conclusion made by the Board, the Board's decision should be reversed.

---

other provisions of this act shall apply . . . to the work of females over twenty-one years of age who are employed in a bona fide executive, administrative or professional capacity . . . ." We therefore do not consider the Act of July 25, 1913, P. L. 1024, as amended, controlling in the instant case.